## WOODWARD ET UX. *v.* LINDLEY ET AL.

EVIDENCE.—*Husband and Wife.*—In an action brought by a husband and wife to recover rent claimed to be due on a written lease made by the husband and wife, it was not error to allow the defendant to testify that he negotiated with the husband when renting the premises, to show the relations of the parties and as tending to establish the agency of the husband for the wife.

WITNESS.—*Husband and Wife.*—*Lease of Wife's Real Estate.*—Where a lease is executed by a husband and wife, but it is stipulated that the rent is payable to the wife, and the premises are to be surrendered to her, an action for the

rent brought in the name of the husband and wife concerns the separate estate of the wife, and the husband has no interest in the action except that he would be liable for costs if the same could not be made out of her property, and in such action the husband is not a competent witness.

LEASE.—*Husband and Wife.—Authority of Husband to Accept Surrender.*— Authority on the part of a husband to receive rent for his wife's premises, and to direct repairs, will not authorize him to accept a surrender of the demised premises.

SAME.—Where the premises of a wife are leased for a term of years, and by the express terms of the lease the surrender of the premises, at the expiration of the lease, by lapse of time or otherwise, is to be to the wife, though the husband may be authorized to accept payment of rent and to direct repairs, handing the keys of the premises to him before the expiration of the term, without stating the purpose of their being handed to him, and his acceptance of them without any agreement that the premises shall be surrendered, or that the lessor may have possession, will not amount to a surrender of the lease and premises.

From the Vanderburg Circuit Court.

*C. Denby* and *D. B. Kumler,* for appellants.

*A. Iglehart, J. M. Shackelford,* and *J. E. Iglehart,* for appellees.

OSBORN, J.—This was an action brought by the appellants against the appellees, to recover the amount alleged to be due upon a written lease. A copy of the lease was filed with the complaint. It was made by the appellants (husband and wife) to the appellees, and the term demised was "from the first day of January, 1867, to the first day of January, 1872." The appellees were to pay to the appellant Adaline a rent of eighteen hundred dollars per year, in monthly instalments of one hundred and fifty dollars at the end of each month, and upon the expiration of the lease, either by lapse of time or otherwise, to surrender the premises peaceably to Mrs. Woodward.

The appellees answered, by alleging that on the 1st day of October, 1870, they paid to the appellants all rent in arrears and all rent due to that date and surrendered the demised premises to the plaintiffs, who accepted the same. To that answer the appellants replied:

1. The general denial.

2. Admitting the payment of rent to October 1st, 1870, except twenty-five dollars, and alleging that the sum of one thousand six hundred and fifty dollars was due for rent from Sept. 1st, 1870, to the bringing of the action, being for eleven months, and denied the alleged surrender.

There was a trial by the court, finding for the appellees, and over a motion for a new trial judgment was rendered on the finding.

The causes assigned for the new trial were: That the court allowed the defendant James F. Lindley to testify that he negotiated with John K. Woodward when he was renting the premises. 2. That the court erred in refusing to allow John K. Woodward to testify as a witness. 3. That the finding was not sustained by the evidence.

The error assigned is in overruling the motion for a new trial.

The court committed no error in allowing the witness to testify that he negotiated with John K. Woodward when he was renting the premises. The appellees were attempting to prove that he was the agent of Mrs. Woodward, who was admitted to be the owner of the demised premises. The alleged surrender was made to him. The evidence was admissible, to show the relations of the parties, and as tending to establish his agency. Its weight would depend upon the other evidence in the case.

The action was upon a joint demise, it is true, but the rent was payable to the wife, and we think we may safely say that the husband joined to enable the wife to make a valid lease. By its terms the rent was not only payable to her, but the surrender was required to be made to her. The action was concerning her separate estate. The husband had no interest in it, except that, having joined her in the action, he would be liable for costs, if it could not be made out of her property. If he testified in the case, he must do so for or against her. The case of *Albaugh* v. *James*, 29 Ind. 398, was an action against husband and wife for the abduction of the wife of the plaintiff. And the court held the husband

could testify in his own behalf and the wife in · hers, but neither for the other. The plaintiff could not deprive them of that right by joining them as defendants in the same action. If the husband in the case at bar had not been joined as plaintiff, it would be clear that he could not be a witness for his wife. He cannot be rendered competent to testify by being joined as plaintiff, under the guise of testifying in his own behalf, when, as in this instance, he had no interest in the action.

The main question in the case is; whether the premises were surrendered and the rent paid to the time of the surrender, as alleged in the answer.

It is not pretended that the surrender was made to Mrs. Woodward in person. If it was made at all, it was made to Mr. Woodward. We give the evidence of the appellees, which they say in their brief is relied on.

One Huckeby testified: "I reside in New Albany, Indiana. In September, 1870, I acted as attorney agent for the defendants, and have been their attorney agent ever since. The Lindleys sent me the keys to surrender the house for them. I took the keys of the store which they rented from Mrs. Woodward into Mr. Woodward's store. There were three keys. One of the clerks asked me what he could do for me. I said I wanted to see Mr. Woodward. As I spoke, Mr. Woodward rose up from near the stove, at the back end of the store, and came to me, and I handed him the keys. I told Mr. Woodward, 'Here are the keys that belong to the store-house that the Lindleys had of yours.' Mr. Woodward looked at them, took them in his hand and said, 'All right; thank you, sir.' I do not know anything about Mr. Woodward acting as the agent of Mrs. Woodward. This was Friday, September 30th, 1870. My distinct impression is, that two festivals were held in the store that had been occupied by the defendants, after they left. My recollection is, that the festivals were held by the Methodist church and the Colored church; they must have been held there, because there was a good deal of plunder in the store next door. I

have been living in New Albany since the 22d day of April, 1870. I have known Mr. Woodward for ten years. After the defendants left, there was a placard hanging in the window of the store, with the words on it: 'This store for rent.' I do not know what was signed to it. My brother paid the last month's rent; I was not present when it was paid; think the store was occupied by a bird man for two weeks. All the rent was paid up to the first of October, when the surrender was made."

On cross-examination, the witness testified as follows:

"My brother's name is George P. Huckeby; he and I are lawyers, and are doing business together in New Albany. I received the keys by express, and before I came here I examined the envelope so as to see when I received it. There were three keys; one small brass key; I do not remember what kind of keys the others were. I do not know the date at which the festivals were held, but think it was fall or winter. The Lindleys left in September. The one hundred and twenty-five dollars was paid the latter part of October or first of November."

James F. Lindley testified as follows:

"My name is James F. Lindley; am one of the defendants. During the tenancy, I paid rent to John K. Woodward, Mrs. Woodward, and to Mr. Welborn, their son-in-law. Rents were paid to them."

In answer to the question, "With whom did you negotiate when you were renting the premises?" he said, "I negotiated altogether with Mr. Woodward." He then proceeded as follows: "When I paid rent, I paid Mr. Woodward; when I wanted anything, I saw him in reference to it. I saw him in reference to the repairs, and he always attended to the repairs. I authorized the Huckebys to make the surrender. When I authorized them to do it, I was in their office. I was in New Albany several times after the surrender was made. I made application to Mr. Woodward for reduction of rent. Previous to the first of June, 1870, I had a

talk with Mrs. Woodward about reducing the rent; I wanted it reduced for several reasons; one reason was, that the plaintiffs had not complied with their agreement about the occupation of the adjoining houses. It was agreed by Mrs. Woodward that the rent should be reduced three hundred per year. When I left New Albany I agreed with Woodward that he was to take an account against Hawkins in part for the last month's rent, for balance of rent. When I was in New Albany, in October, Mr. Woodward said he could not accept the account for the rent. I sent money to Huckeby & Huckeby, and they paid the rent. In October or November I was in New Albany. I went to Mr. Woodward and asked him to lend me the key of the store to get some rubbish that I had promised to Kent. He loaned me the key and cautioned me to return it to him, and not leave it with Kent. The first key would not open the door; I went back and got another. We got into the store. I left the key with Mr. Kent. The next evening I saw Mr. Woodward, and he asked me why I had not returned the key. I went and got it for him, and delivered it to him. I have receipts for the rent; they are in this book." [Then follow the receipts.]

The receipts show the payment of the rent in full to Aug., 1870, inclusive. The one for December is for one hundred and twenty-five dollars on account of rent for that month.

Cross-examination.—" I paid the rent sometimes, and sometimes the book-keeper paid it. This book contains all the receipts except the last. Mrs. Woodward came to the store for the rent. In one instance we were authorized to pay Mr. Welborn. Mrs. Woodward went to England, and during her absence we paid her son-in-law. Once we paid $500. Mrs. Woodward did not come every month, but came often. After the first of March, 1870, I paid one hundred and fifty dollars every month, and she paid me twenty-five dollars back. I did not leave the keys with Mr. Woodward to get a tenant. I did not go to Mr. Woodward and tell him that Mr. McKitrick had the keys. I brought the keys to Evans-

ville when I came, about the 12th or 14th of September. I never tried to rent the store to a man in Louisville. I never authorized any one else to rent the store. I came off and left the store, and have done nothing else but send keys there. There was a festival in the store next door to us, two months before we came down to Evansville. I do not remember how often I paid Mrs. Woodward rent; but not often. The receipts will show."

The defendant then read the following receipt:

"New Albany, Ind., Feb. 11th, 1871.

"Received of J. F. Lindley & Bro. one hundred and twenty-five dollars on rent account, for Mrs. A. Woodward.

"John K. Woodward."

Mrs. Woodward testified in her own behalf, that she never accepted any surrender; that none was ever offered her; that she told Hiram Lindley she would not release them from paying rent; that she refused one hundred and twenty-five dollars rent offered her by George Huckeby, the brother of the witness Huckeby; that she told Geo. Huckeby after the key had been left at her husband's store to take it and attend to the renting himself, and Geo. Huckeby said all right; this was in November or December, 1870; that she collected her own rents and told James Lindley that he must pay to her in person; that she refused to reduce the rent, but agreed that if one hundred and fifty dollars was paid her every month promply, she would give him back twenty-five dollars a month as a donation; that she never put any placard in the window and authorized none to be put there; that no festival was ever held in the store; that the store remains exactly as Lindleys left it; that she told J. F. Lindley in November not to break the door, but get the key when he wanted his friends to go in the store; that J. F. Lindley, in November, 1870, asked J. K. Woodward if he had got a tenant for him; that twenty-five dollars of rent remains in arrear up to October 1st, 1870; that her husband was not her agent, and she had no agent; that Woodward assisted her in fixing up the lease; that the lease was drawn after the Lindleys were

in the house ; that nothing was ever said to her by either of the Lindleys about surrendering the premises ; that she had a talk with Hiram, in which she said that if Jim left she would rent the premises to Hiram, but if both went to Evansville, she would have all the rent ; that when she was absent her husband or Mr. Welborn collected the rent, but she always collected when at home. She said, " After I heard the key was left at the store, this was in November or December, 1870, I went to see George Huckeby ; I met him on the street ; I told him to go and get the key of the store and attend to the renting of it himself ; that Mr. Woodward had too much to do to attend to it for the Lindleys. He said, 'all right.' "

There was no evidence showing that Mr. Woodward had any authority to accept a surrender as the agent of Mrs. Woodward. The appellees contend that, because he was her agent to receive rent and make repairs to the building, it followed that he was authorized to accept a surrender of the demised premises. We think otherwise. The authority to collect the rent recognized the existence of the lease, and that it would continue uncancelled and in full force; the authority to accept a surrender contemplated its destruction. One is to accept performance of the contract, the other a release from it. Huckeby testified that he knew nothing about Mr. Woodward acting as the agent of Mrs. Woodward. The appellees sent him the keys to surrender, and he handed them to Mr. Woodward, saying, " Here are the keys that belong to the store-house that the Lindleys had of yours." He did not even state why he gave them to him. Nothing was said about surrendering the lease or the house. He also testified that his distinct impression was that two festivals were held in the store, and that there was a placard in the window of the store after the appellees left, with the words on it, " This store for rent;" but he does not state whether the festivals were held or the placard was in the window after he gave up the keys. Nor does he state when the bird man occupied the store. The evidence fails

to show that Mrs. Woodward ever went into possession of the premises.

The court below must have found for the appellees, on the ground that Mr. Woodward, being the agent for his wife to receive rents, was her agent to accept a surrender of the lease and premises, and that the acceptance of the keys was an acceptance of such surrender.

"It may be assumed that there must be a mutual agreement between the lessor and original lessee, that the lease is terminated, in order to work a surrender. But this may be implied and not always be express. * * * And the return and acceptance of the key may be evidence of such surrender of possession." 1 Washb. Real Prop. 354.

The key must be returned and accepted with a view to terminate the tenancy, to make it evidence of a surrender. "An actual and continued change of possession, by the mutual consent of the parties, will amount to a surrender by operation of law." Taylor Landlord & Tenant, sec. 515.

"A surrender is defined to be the yielding up of an estate for life or years to him who has an immediate estate in reversion or remainder, wherein the estate for life or years may drown or merge by mutual agreement between the parties." 2 Platt Leases, 499.

In the case at bar it is admitted that the reversion was in Mrs. Woodward. By the express terms of the lease the surrender was to be to her. We are clearly of the opinion that there was no surrender to her or any agent authorized to accept such surrender. Mr. Woodward, as we have seen, had no such authority, nor did he attempt to exercise any. The agent of the appellees handed the keys of the store to him without stating the purpose, and he accepted them. There was no agreement that the premises should be surrendered, or that the lessor might have possession of the store. Nothing was said or done that could have prevented the appellees from demanding the keys and occupying the store.

Surrenders are said to be "either in express words, by which

the lessee manifests his intention of yielding up his interest in the premises to the lessor; or by operation of law, when the parties, without any express surrender, do some act which implies that they have both agreed to consider the surrender as made." Taylor L. & Ten., sec. 507. An express surrender is by agreement. The term, surrender by operation of law, "is applied to cases where the owner of a particular estate has been a party to some act, the validity of which he is by law afterward estopped from disputing, and which would not be valid if his particular estate had continued to exist. * * * In such case it will be observed there can be no question of intention. The surrender is not the result of intention. It takes place independently, and even in spite of intention." *Lyon* v. *Reed*, 13 M. & W. 285–305. Many instances are given in which a surrender by operation of law has been made, but we have not been able to find one in which it has been so held, where the lessee simply handed the key of the premises to the lessor, without in any manner declaring or making known his purpose, and when no change of possession followed the delivery of the key. Nor have we been able to find any case where an authority to receive rent and make repairs could be construed into an authority to receive a surrender of the demised premises.

In the case at bar, by the uncontradicted testimony of Mrs. Woodward, it appears that as soon as she heard of the delivery of the keys to her husband, she went to the agent of the appellees and told him to go and take them back and attend to the renting of the property for the appellees himself, to which he assented.

We are unable to find in the testimony any evidence of a surrender. The new trial ought to have been granted.

The judgment of the said Vanderburg Circuit Court is reversed, with costs; the cause is remanded, with instructions to that court to grant a new trial, and for further proceedings not inconsistent with this opinion.